**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Jeffrey C. Stone, Inc. d/b/a/ Summit Builders Construction Corporation,<br><br>            Plaintiff,<br><br>vs.<br><br>Greenberg Traurig, LLP, et al.,<br><br>            Defendants. | No. CV 09-2454-PHX-MHM<br><br>**ORDER** |

On September 22, 2010, the Court issued Plaintiff an order to show cause ("OSC") in writing why the Court should not impose sanctions against Plaintiff and its counsel, Grant H. Goodman, based on its "concerns regarding Summit's meritless action, that produced a record containing over 2300 pages, [requiring multiple] Defendants to file multiple motions to dismiss, as well as Summit's lack of candor with the Court both in its pleadings and during oral argument." (Doc. 218)

Prior to the Court's issuance of the OSC, Defendants had filed motions for sanctions pursuant to, among other bases, Rule 11 of the Federal Rules of Civil Procedure (Doc. 206),

the Court's inherent power (Doc. 212),[1] and 28 U. S. C. 1927 (Doc. 213).[2]

## I. Background

Plaintiff Jeffrey C. Stone, Inc. d/b/a Summit Builders Construction Company ("Summit") filed its original Complaint on November 23, 2009 against twenty-seven Defendants. Thereafter, Defendants filed motions to dismiss the Complaint. (Docs. 11, 19, 20, 22, 29, 32, 63, 74) Summit did not file responses to these motions but instead, on January 18, 2010, filed an Amended Complaint. (Doc. 68). In its Amended Complaint, Summit alleged violations of Federal RICO (18 U.S.C. § 1961 *et seq.*) and the Arizona Racketeering Act (A.R.S. § 13-2314.04) statutes; Securities Fraud under Federal law (28 U.S.C. § 1658(b)) and the National Securities Markets Improvement Act (§ 18(b)(4)(d)); Tortious Interference with Contract; Civil Rights Violations (42 U.S.C. § 1983); Breach of the Uniform Fraudulent Transfer Act (A.R.S. § 44-1001 *et. seq.*); and Legal Malpractice/Accounting Malpractice/Beach of Fiduciary Duty. (Doc. 68) Summit alleged that it was owed more than $9 million under two construction contracts that went unpaid when lender Mortgages Ltd. went bankrupt. Summit contended that Defendants caused Mortgages Ltd. to go bankrupt and that Defendants were therefore liable for this debt.

More specifically, Summit alleged that it contracted with Osborn III Partners, LLC and Central and Monroe, LLC to serve as the general contractor for two construction projects, Ten Lofts and Hotel Monroe (the "Projects"). (Doc. 68 ¶ 2 and Ex. 2, 3) Mortgages Ltd. provided the funding for the Projects. (Doc. 68 ¶ 3) According to Summit, Osborn III Partners and Central and Monroe were controlled by Defendants Jonathan and Lori Vento and Donald and Shirley Zeleznak, who were directors or officers of the now-bankrupt owner of the Projects, Grace Communities. (Doc. 68 ¶¶ 2 n.2, 49, 51)

Summit alleged that the Ventos and Zeleznaks, as well as former Mortgages Ltd.

---

[1] Joinders at Docs. 214, 219, 221, 222, 224, 225, 226.

[2] Joinders at Docs. 217, 219, 221, 222, 224, 226.

- 2 -

1  officers and directors, and certain attorneys, accountants, financial advisors, and auditors
2  retained by Mortgages Ltd. over the years "colluded for the common benefit of a single
3  group," which Summit referred to as the "Enterprise" or "Syndicate." (Doc. 68 ¶1)

4  Comparing the Enterprise to Bernie Madoff and Worldcom, Summit alleged that the
5  Enterprise "built a classic *Ponzi* scheme," driving "the primary obligors ML and RB [Radical
6  Bunny] into insolvency." (Doc. 68 ¶¶ 1, 4) Summit further alleged that "[o]nce Defendants
7  . . . had exhausted the financial resources of ML and RB, they moved lock-step to be
8  'appointed' financial caretakers for the same entities in bankruptcy." (Doc. 68 ¶ 4)
9  Thereafter, according to Summit, the "professional" Defendants "would compete for even
10 more cash . . . by diverting the only assets available from the liquidation" of the entities'
11 assets in the bankruptcies as "'professional priority administrative claimants.'" (Id.)

12 Summit alleged that the Enterprise "made contractual warranties of financial solvency
13 to Summit," however, "[r]ather than paying Summit for work performed," the Enterprise
14 "devised a scheme to siphon assets away," and as a result, Summit "was denied payment
15 exceeding $9,000,000.00." (Doc. 68 ¶¶ 2, 4)

16 Thereafter, Defendants filed motions to dismiss the Amended Complaint. (Docs. 79,
17 81, 84, 89, 91, 94, 100, 115, 199, 202) Defendants argued that with respect to the RICO
18 claims, Summit lacked standing to pursue such claims, and in addition, failed to adequately
19 allege proximate cause. Defendants also argued that Summit did not have standing to bring
20 a claim for securities fraud because it failed to plead facts showing that it was a purchaser
21 or seller of securities. With respect to Summit's tortious interference with contract claim,
22 Defendants argued, among other things, that Summit failed to meet even the first element of
23 such a claim because it had not alleged that it had a direct contractual relationship with
24 Mortgages Ltd., the alleged subject of the tortious interference. Further, Defendants argued
25 that because Summit failed to allege that any of the Defendants acted under color of state
26 law, it failed to state a claim under 42 U.S.C. § 1983. As to Summit's claim of breach of the
27 Uniform Fraudulent Transfer Act, Defendants argued that even if Summit was a creditor of
28

- 3 -

Mortgages Ltd., it would nevertheless lack standing to bring such a claim because only the bankruptcy trustee has standing to pursue fraudulent transfer and fraudulent conveyance actions for the benefit of all creditors, and that such claims had been transferred to the Liquidating Trustee appointed under the confirmed bankruptcy plan.

With respect to Summit's legal malpractice claim, Defendant attorneys argued that Summit failed to allege facts to demonstrate that it had an attorney-client relationship with them or, in the alternative, that they owed a duty of care to non-client Summit. Defendants further contended that Summit's breach of fiduciary duty claim failed because such a claim requires proof of an actual attorney-client relationship, which Summit failed to allege. Finally, with respect to Summit's accounting/auditing malpractice claim, the accountant/auditor Defendants argued that Summit failed to allege the necessary element that it is "one of a limited group of persons for whose benefit and guidance" Defendants provided information. Defendants further argue that Summit failed to identify the alleged "misrepresentations" on which it supposedly relied.

Thereafter, Summit filed responses to the motions to dismiss, and Defendants filed replies thereto. The Court granted Summit's request for oral argument, and on August 30, 2010, the Court held a three-hour hearing on the motions. One day later, on August 31, 2010, Plaintiff filed a Notice of Voluntary Dismissal pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(i).[3]

**II.  Discussion**

**Sanctions Under the Court's Inherent Power**

Federal courts have the inherent power to assess attorney's fees against counsel in response to abusive litigation practices. Roadway Express, Inc. v. Piper, 447 U.S. 752, 765 (1980); Chambers v. PASCO, Inc., 501 U.S. 32, 45, 46 (1991) (courts have the inherent

---

[3] Rule 41(a)(1)(A)(i) provides that a "plaintiff may dismiss an action without a court order by filing . . . a notice of dismissal before the opposing party serves either an answer or a motion for summary judgment." Such dismissal is "without prejudice." Fed. R. Civ. P. 41(a)(1)(B).

power to assess attorney's fees against counsel who has acted in bad faith, wantonly, vexatiously, or for oppressive reasons).  A district court may impose sanctions if it "specifically finds bad faith or conduct tantamount to bad faith." Fink v. Gomez, 239 F.3d 989, 994 (9th Cir. 2001). "Sanctions are available for a variety of types of willful actions, including recklessness when combined with an additional factor such as frivolousness, harassment, or an improper purpose." Id.  In Fink, the Ninth Circuit held that "an attorney's reckless misstatements of law and fact, when coupled with an improper purpose . . . are sanctionable under a court's inherent power." Id.

Here, Summit's actions, as well as its misstatements of both fact and law in its briefs and at oral argument, which continue unabated in its Responses to this OSC, evidence bad faith. Some illustrative examples follow.

On January 14, 2010, during the pendency of this case, Summit improperly removed probate case PB2008-001651, In the Matter of the Estate of Scott M. Coles, from the probate court to the district court. In Summit's Response (Doc. 108) to Defendant Coles Estate's Motion to Remand, Summit not only failed to cite any authority to support removal, but blatantly mischaracterized the holding of Marshall v. Marshall, 547 U.S. 293 (2006), as having "entirely done away with" the probate exception.[4] In its July 29, 2010 remand order, the Court warned Summit that further misrepresentation of the law could result in the imposition of sanctions. (Doc. 191)

Summit represented to this Court both in briefing and at oral argument that in Bridge v. Phoenix Bond & Indem. Co., 128 S. Ct. 2131 (2008), the Supreme Court had dispensed with a direct injury requirement in the context of RICO claims. (Doc. 187 at 5; Tr. at 42) Bridge says only that a RICO plaintiff claiming mail fraud as a predicate act need not have

---

[4] "[T]he probate exception[] is a practical doctrine designed to promote legal certainty and judicial economy by providing a single forum of litigation, and to tap the expertise of probate judges by conferring exclusive jurisdiction on the probate court." Wisecarver v. Moore, 489 F.3d 747, 749 (6th Cir. 2007) (quoting Markham v. Allen, 326 U.S. 490, 494 (1946)).

- 5 -

1  been the party to directly rely on the misstatement sent through the mail, but must still have
2  been directly injured by the sending of the false statement.

3  Summit misrepresented the holding of SEC v. Zandford, 535 U.S. 813 (2002), to try
4  to avoid the holding of Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723 (1975), that
5  only a purchaser or seller of securities may pursue a claim for securities fraud. (Doc. 107 at
6  17) At the hearing, counsel for Summit conceded—after requiring Defendants to brief the
7  issue and prepare to argue it at the hearing—that Summit could not pursue a claim for
8  securities fraud and withdrew that count. (Tr. at 65: "And they are correct, in the purchase
9  or sale, that's not [what] we are doing here.").

10  Summit cited United States v. Warneke, 310 F.3d 542 (7th Cir. 2002), to support the
11  proposition that bankruptcy fraud and fraudulent transfers can be predicate acts. (Doc. 187
12  at 10). Warneke is a criminal RICO case about a motorcycle gang, addressing guns,
13  shootings, and drugs, not bankruptcy or fraudulent transfers.

14  Summit cited Natomoas Gardens v. Sinadinos, 2009 LEXIS 110063 (E.D. Cal. 2009),
15  for the proposition that there could be RICO standing for an individual injury apart from a
16  corporation. (Doc. 119 at 13-14). That case does not mention the word "RICO" and does
17  not address RICO standing issues. Instead it deals with a motion to substitute counsel.

18  In Summit's Response to Greenberg Traurig's Motion to Dismiss Amended
19  Complaint and Response to Estate of Scott M. Coles' Joinder, Summit cited Qantel Corp. v.
20  Niemuller, 771 F. Supp. 1372 (S.D.N.Y 1999) to support its allegation that it has RICO
21  standing. (Doc. 119 at 16). Summit stated that the court in Qantel "analyzed the question
22  of whether a shareholder had standing to bring a racketeering suit against defendants who
23  had manipulated equipment leases and their receivables arising from those leases." The cited
24  case, however, concerns an action in which the director of a corporation sought an order
25  requiring the corporation to pay his attorney's fees during the pendency of the action.

26  Summit's Response to Francine Coles' Motion to Dismiss contains an eight-line block
27  quotation which cannot be found in either of the two cited cases. (Doc. 114 at 4) These

28

- 6 -

1  examples are but a few of Summit's many erroneous or incomplete citations.

2  Summit requested oral argument, which the Court granted.  Despite several attempts
3  by the Court to accommodate counsel's request to familiarize himself with the courtroom
4  audio-visual system, counsel failed to take advantage of these opportunities and was woefully
5  unprepared for the hearing.

6  During oral argument, in response to the Court's questioning, counsel stated that
7  Summit had filed a proof of claim in the Mortgages Ltd. bankruptcy proceeding, which the
8  bankruptcy record demonstrates otherwise.  Counsel also stated that Summit contracted with
9  Mortgages Ltd., which the record demonstrates to the contrary.  As discussed above, Summit
10 made other misstatements during the hearing about the holdings of certain cases.

11 Less than twenty-four hours after the conclusion of the hearing, Summit filed a
12 voluntary notice of dismissal.  Although the plain language of Rule 41(a)(1)(A)(i) allows a
13 plaintiff to dismiss an action without prejudice before the opposing party serves either an
14 answer or a motion for summary judgment, Summit's eleventh-hour dismissal–after multiple
15 Defendants were required to brief two rounds of motions to dismiss and prepare for an oral
16 argument requested solely by Summit–violates the purpose of the rule.  Rule 41(a)(1) was
17 designed to "allow[] a plaintiff to dismiss an action without the permission of the adverse
18 party or the court only during the brief period before the defendant [has] made a significant
19 commitment of time and money."  Cooter and Gell v. Hartmarx, 496 U.S. 384, 397 (1990).

20 Summit and Summit's counsel, Grant Goodman, filed separate responses to the
21 Court's subsequent OSC.  Counsel's responses (Docs. 243 and 248)[5] are at times
22 incomprehensible, assert intemperate and unsupported allegations about certain Defendants,
23 and contain further misstatements of law and fact.  For example, although the language is
24 difficult to decipher, counsel appears to assert that the Court is without authority to issue
25 sanctions, including sanctions under its inherent authority: "Due to framing, or lack thereof,

---

[5] Identical documents were filed at 244 and 249.

- 7 -

of the Order to Show Cause a reroute to the 'inherent authority' train and 28 U.S.C. § 1927 and the apparition of 'bad faith' left the station, ironically, within 5 days of the issuance of the following opinion's issuance. *Cf. Lawrence vs. Richman Group of CT LLC, et al.*, (2nd Cir. September 16, 2010)." (Doc. 248 at 5)  First, counsel fails to include a complete citation to authority, as he does elsewhere in his brief.  Next, Lawrence addresses sanctions imposed under Rule 11 and its safe harbor provision. 620 F.3d 153, 159.  Here, Summit's dismissal did not deprive the Court of jurisdiction to impose sanctions. "[A]ttorney fees and sanctions are by nature collateral to the merits [of a case] and therefore properly within a district court's jurisdiction even after a dismissal under Rule 41(a)."  Building Innovation Indus., L.L.C. v. Onken, 473 F. Supp.2d 978, 983 (D. Ariz. 2007) (citing Moore v. Permanente Med. Group, Inc., 981 F.2d 443, 445 (9th Cir. 1992), and Cooter & Gell, 496 U.S. at 396).  Further, the safe harbor provision is incorporated in Rule 11(c)(2); the provision does not apply to sanctions imposed under a court's inherent power.

Counsel also misrepresents proceedings in the bankruptcy court that occurred subsequent to the dismissal of this case. Counsel states that

> Three weeks later….Summit in the ML bankruptcy 'objects' to sale of the Ten Lofts Project by ML "free and clear" arising out of ML inequitable conduct in the form of; (a) payment guarantee failure as a condition precedent contractually and by statute; (b) direct contact by ML executive officers to Summit (and its subcontractors) rendering payment "assurances" and ratification of the contractual warranties of payment; © failure to fund; (d) untimely contractual funding described as "erratic" and a legal proximate cause in anticipatory breach; (e) required application of non-bankruptcy law in favor of Summit as creditor; (f) and, title insurance indemnification as an intended beneficiary arising out of title insurance bought by ML. (See, Dkt. #2961, 9/21/2010, 2:08-bk-07465). One week later on September 28, 2010 through Court Order of October 1, 2010 Summit unconditionally  was paid as a super-priority "creditor", and not as a general unsecured claimant, together with accruing interest on its amount of damages sustained for $3,445,095.79. (See Dkt. #2976).

(Doc. 244 at 4-5)

Counsel's statement that Summit was "unconditionally . . . paid . . . on its amount of damages sustained" distorts the facts. In its October 1, 2010 Order approving the sale of the property, the Bankruptcy Court ruled as follows:

- 8 -

> To address the Summit Objection to the extent necessary to permit the sale as provided in this Order, as a condition to the completion of the sale of the Property and prior to any other distribution of Sale Proceeds authorized in this Order, Sale Proceeds, in the sum of $3,445,095.79 shall be deposited and held in escrow (the "Escrowed Sale Proceeds") for the sole benefit of Summit Builders and ML Manager, free from any other claims or interests other than the undivided ownership interests of Osborn III Loan LLC and the pass-through investors, with the alleged liens and interests of Summit Builders and ML Manager to attach to the Escrowed Sale Proceeds in the same manner, extent and priority that such liens and interests held in the Property as they existed immediately prior to the sale of the Property provided for in this Order. The Escrowed Sale Proceeds shall be deposited in an interest-bearing account with the title company handling the closing, or another escrow company mutually agreeable to ML Manager and Summit Builders, and shall be disbursed only pursuant to further Order of this Court, upon appropriate notice to parties asserting an interest in the Escrowed Sale Proceeds. All disputes, arguments, claims, other lien interests and defenses of and between Summit Builders and ML Manager as the Manager and Agent are preserved.

In re Mortgages Ltd., 2:08-bk-07465-RJH (Doc. 2976). Pursuant to the bankruptcy court's Order, the sum of $3,445,095.79 was placed in an escrow account for the benefit of both Summit and ML Manager, with disbursement by the bankruptcy court conditioned upon a future state court determination regarding the contested issue of Summit's lien priority. Id. (Doc. 2961) Thus, contrary to counsel's assertion, Summit was not "unconditionally paid."

Summit filed a separate response to the Court's OSC (Doc. 230), in which it does "not attempt to defend or otherwise justify the pleadings filed on its behalf . . . by its former counsel Grant Goodman." Summit asserts that it "has essentially repudiated those pleadings when–immediately following Mr. Goodman's performance at oral argument on August 30, 2010–it dismissed the entire case . . . ." Moreover, Summit states that it "will not dispute the reasonableness of the amount sought by Defendants" except to the extent that the motions and applications for fees do not comply with Local Rule 54.2.

Summit maintains that "all of the objectionable conduct here lies at the feet of Mr. Goodman" and that it was "affirmatively misled by Mr. Goodman." Summit alleges that during oral argument it "realized that Mr. Goodman's responses to the Court . . . could not be squared with Mr. Goodman's earlier representations to Summit regarding the good

- 9 -

1  faith basis for the allegations in the pleadings."

2  According to Summit's own description, Summit "is a large, sophisticated
3  contractor who possesses a high level of experience and expertise in the business
4  administration, construction management and superintendence" of complex and high-
5  quality projects. (Doc. 68, Ex. 3 "Standard Form of Agreement Between Owner and
6  Contractor") Summit is also experienced in litigation, having been represented by firms
7  such as Fennemore Craig and Graif Barrett & Matura. (Doc. 230; 2:08-bk-07465-RJH,
8  Doc. 2976) In addition, Summit employs in-house counsel. Yet despite this level of
9  business and legal sophistication, Summit argues, incredibly, that it relied entirely upon
10 Mr. Goodman's representations regarding the good faith basis for the allegations in the
11 pleadings and therefore should be held blameless.

12 Summit, however, cannot shift the blame for what it admits is "objectionable
13 conduct" entirely onto counsel. The Court finds that Summit had an obligation to make at
14 least a cursory inquiry into Mr. Goodman's representations in the pleadings and its failure
15 to do so does not excuse it but rather suggests bad faith. Further, at oral argument,
16 Summit stood by and allowed its counsel to make blatant misrepresentations of both the
17 facts and the law. The Courts finds that Summit's inactions described above, its eleventh-
18 hour dismissal, which violates the purpose of Rule 41(a)(1), as well as its improper
19 removal of the probate case, constitutes conduct that is tantamount to bad faith.
20 Accordingly, the Court will assess attorneys' fees against Summit as well as its counsel.
21 See Leon v. IDX Sys. Corp., 464 F.3d 951, 961 (9th Cir. 2006) (explaining that a district
22 court may award sanctions under its inherent powers against a party or his counsel when
23 either acts in bad faith); accord Byrne v. Nezhat, M.D., 261 F.3d 1075, 1106 (11th Cir.
24 2001).

25 **III.   Conclusion**

26 In sum, the Court finds that counsel's repeated misrepresentations concerning the
27 facts and law in his briefing and during oral argument, despite warning by the Court,

28

- 10 -

1  coupled with counsel's continued misrepresentations in his responses to the Court's OSC,
2  cannot be attributed to mere carelessness but rather constitute an improper effort to
3  mislead both the Court and opposing counsel.  Counsel's actions in this regard, as well as
4  his improper removal of the probate case and voluntary dismissal at the eleventh hour,
5  constitutes conduct tantamount to bad faith and, as such, is sanctionable under the Court's
6  inherent power.
7  　　　　Further, the Court finds that Summit's failure to make a reasonable inquiry into
8  Mr. Goodman's representations, its silence in the face of counsel's misrepresentations to
9  the Court, its eleventh-hour dismissal, as well as  its improper removal of the probate
10 case, is conduct tantamount to bad faith.
11 　　　　Accordingly, pursuant to its inherent power, the Court will award attorney's fees
12 as sanctions against both Summit and its counsel, Grant Goodman.  In light of the award
13 of sanctions under this authority, the Count need not address the imposition of sanctions
14 under Rule 11 or 28 U. S. C. 1927.
15 　　　　Based on the foregoing,
16 　　　　**IT IS ORDERED** granting Defendant Greenberg Traurig LLP's Motion for
17 Attorney Fees Pursuant to the Court's Inherent Power in the amount of $27,300.  (Doc.
18 212)
19 　　　　**IT IS FURTHER ORDERED** awarding attorney's fees to Defendants DeConcini
20 McDonald Yetwin & Lacy, P.C. in the amount of $15,592.50.
21 　　　　**IT IS FURTHER ORDERED** awarding attorney's fees to Defendant Francine
22 Coles in an amount to be determined upon compliance with the requirements of LR Civ.
23 54.2.
24 　　　　**IT IS FURTHER ORDERED** awarding attorney's fees to Defendant Coles
25 Estate in an amount to be determined upon compliance with the requirements of LR Civ.
26 54.2.
27 　　　　**IT IS FURTHER ORDERED** awarding attorney's fees to Defendants Ashley
28

Coles, Christopher Olson and Rachel Schwartz-Olson, George and Mary Jane Everette, Mike and Donna Denning, Nechelle and John Doe Wimmer, Phillip Sollomi, Jr. and Carolyn L. Sollomi in an amount to be determined upon compliance with the requirements of LR Civ. 54.2.

**IT IS FURTHER ORDERED** awarding attorney's fees to Defendant MCA Financial Group, Ltd. in an amount to be determined upon compliance with the requirements of LR Civ. 54.2.

**IT IS FURTHER ORDERED** awarding attorney's fees to Defendants Mayer Hoffman McCann P.C. and CBIZ Accounting, Tax & Advisory Services, LLC in an amount to be determined upon compliance with the requirements of LR Civ. 54.2.

**IT IS FURTHER ORDERED** awarding attorney's fees to Defendants Zeleznak Family Trust, Vento Family Trust, Jonathan and Lori Vento, Donald and Shirley Zeleznak, and Ryan Zeleznak in an amount to be determined upon compliance with the requirements of LR Civ. 54.2.

**IT IS FURTHER ORDERED** awarding attorney's fees to Defendants Hirsch & Shah, CPAs LLC in an amount to be determined upon compliance with the requirements of LR Civ. 54.2.

On July 29, 2010, the Court granted the Coles Estate's Motion to Remand. (Doc. 191) At that time the Court also granted the Coles Estate's request under 28 U.S.C. § 1447(c) for attorney's fees and costs incurred as a result of the removal. (Id. at 4.) The Coles Estate having submitting its fee application pursuant to LR Civ. 54.2, and the Court having reviewed it for reasonableness,

**IT IS FURTHER ORDERED** awarding the Coles Estate attorney's fees and costs in the amount of $15,511.45, to be paid by Summit as originally ordered.

In light of the foregoing,

**IT IS FURTHER ORDERED** denying as moot MCA Financial Group, Ltd.'s Motion for Rule 11 Sanctions. (Doc. 206)

- 12 -

**IT IS FURTHER ORDERED** denying as moot Defendants DeConcini McDonald Yetwin & Lacy, P.C.'s Application for Award of Attorney's Fees. (Doc. 213)

In light of the award of attorney's fees to Defendant Francine Coles above, and in the Court's discretion,

**IT IS FURTHER ORDERED** denying Defendant Francine Coles' Motion for [Further] Sanctions Against Grant H. Goodman. (Doc. 250)

**IT IS FURTHER ORDERED** that Defendants shall submit their fee applications pursuant to LR Civ. 54.2 within 14 days of the entry of this order.

**IT IS FURTHER ORDERED** that within 20 days of the service of this order, Plaintiff's and Defendants' counsel shall jointly cause the delivery of a copy of this order to the appropriate authority within the Arizona State Bar for whatever further investigation, review, or action it may deem appropriate.

DATED this 21st day of March, 2011.

_____
Mary H. Murguia
United States District Judge